UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BEST BRANDS CONSUMER PRODUCTS, INC.<br><br>   Plaintiff,<br><br>v.<br><br>PREMIUM RETAIL SERVICES, INC.<br><br>   Defendant. | Civil Action No.:<br><br><br>(JURY TRIAL DEMANDED) |

## COMPLAINT

Plaintiff Best Brands Consumer Products, Inc. ("Best Brands" or "Plaintiff") by its attorneys, hereby complains of Defendant Premium Retail Services ("Premium" or "Defendant"), as set forth below.

### JURISDICTION AND VENUE

1. Best Brands brings this action against Premium for breach of an oral and/or written contract to provide certain merchandising services for Best Brands in Walmart's retail stores (or in the alternative for unjust enrichment *in quantum meruit*), as well as for breach of express warranty, fraud, tortious interference, and trade defamation.

2. The present claims arise under this Court's diversity jurisdiction.

3. This Court has original jurisdiction over the claims of this civil action pursuant to 28 U.S.C. §1332(a), in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States, with complete diversity between the parties.  This Court also has jurisdiction pursuant to its supplemental jurisdiction under 28 U.S.C. §1367.

4.     This Court has personal jurisdiction over Defendant, and venue is proper in this Court, under CPLR §§301 and/or 302 in that Premium has repeatedly transacted business with Best Brands in New York directly related to the causes of action in this matter.  Upon information and belief, Premium has also consistently and systematically done business in the State of New York,

5.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) - (d).

## THE PARTIES

6.     Plaintiff Best Brands Consumer Products Inc. ("Best Brands") is a corporation organized and existing under the laws of the State of New York having a principal place of business at 25 Merrick Avenue, Merrick, New York 11566 and a sales office at 20 West 33rd Street, 5th Floor, New York, New York 10001.

7.     Defendant Premium Retail Services, Inc. ("Premium") is, upon information and belief, a corporation organized and existing under the laws of Missouri having a principal place of business in 618 Spirit Drive, Suite 200, Chesterfield, Missouri 63005.

## FACTS

8.     Plaintiff Best Brands is a company that sells a wide selection of popular consumer products to retailers, such as Walmart.

9.     Walmart, the largest retailer in the United States, is an important and long-standing customer of Best Brands.

10.    Best Brands has spent years building up its relationship and good reputation with Walmart.

11.     Best Brands is a 62-year-old family-owned company that has been supplying Walmart and Sam's Club for over 40 years.

12.     Among the products that Best Brands supplies to Walmart are "clip strip" products.  A clip strip is a strip of plastic having products suspended from the strip.  They are commonly suspended from various structures in a retail store, such as shelves, "endcap" displays, and double-sided hangers.  Clip strip products are a large and significant part of Best Brands' business with Walmart.

13.     Best Brands is one of the leading suppliers of impulse and clip strip items in the U.S., and has been the #1 supplier in Dept. 82 of clip strip products at Walmart since 2010.

14.     Best Brands also has successfully been the Walmart Category Advisor for the Clip Strip and Sidekick Category for the last four years.

15.     In 2015, Walmart Dept 82 recognized Best Brands' contribution to Dept 82 and Walmart's Grocery Department by nominating Best Brands for Supplier of the Year.

16.     Premium is a merchandising services firm.

17.     Premium was hired to send representatives to retail stores to provide merchandising services in those retail stores, for the purpose of facilitating the promotion and sale of Best Brands' products in those stores.

18.     As examples, Premium was hired to do the following:  to regularly and consistently check each of Walmart's retail stores to see which of Best Brands' products are in low volume and to refill them; to make sure the displays of Best Brands' products

are presentable to customers; to consolidate like items to a single clip strip; to move clip strips from one location to another; to keep track of which of Best Brands' products are being sold well; to keep track of backroom inventory; to move clip strip backroom inventory to approved sales floor locations; to keep clip strips stocked with product; to "pack out" products that are available in the backroom each store visit, i.e. to remove products from the cartons in the store's backroom and place them in the stores for purchase by customers; and to take charge of managing and boosting the sales of Best Brands' products at store level through the proper execution of Premium's services.

19.     Premium was hired to provide these services both for Best Brands and for other suppliers to Walmart.  In particular, Walmart negotiated the service terms with Premium on behalf of Best Brands and all of Walmart's other clip strip suppliers. Premium was hired to service Walmart's entire clip strip program, and to act as a service provider that all clip strip suppliers at Walmart must work with.

20.     As such, the terms of Premium's contract were negotiated by Walmart, and then accepted by Premium and Best Brands (as well as by Walmart's other suppliers).

21.     Pursuant to that contract, Premium promised to deliver merchandising services such as those set forth above.

22.     In addition, Premium's service and fee structure was designed to be less expensive in price than its competitors, as Premium asserted that it would bill based on actual staff hours worked (rather than as a percentage of Best Brands' retail sales at Walmart).

23.     Furthermore, one of the purposes of the contract was to take the load off of Walmart's employees, which meant that Premium was to be solely responsible for merchandising all of the clip strip items at all  Walmart stores.

24.     By hiring Premium as a merchandising services firm, Premium was supposed to manage the merchandising of products in the store, so Walmart's employees would not have to.

25.     As part of its job, Premium was specifically paid to send representatives into each Walmart store, with the mission to service the clip strip products in those stores, to maximize Best Brands' sales in every way possible.

26.     Premium's appointed tasks, such as the tasks of:  ensuring that products are moved from the backroom onto shelves; ensuring that the presentation of products is appealing and professional; refilling any products that  have low inventory on the retail sales floor ; reporting when restocking of products is required; and overseeing and managing the clip strip product sales at store level; were geared to those objectives of taking the burden off of Walmart employees and maximizing Best Brands' sales.

27.     Premium, however, has been consistently failing to perform its job properly, and in many cases failing to perform its job at all.

28.     Yet, Premium has been charging Best Brands for Premium's underperformance and non-performance.

29.     In many cases, Premium has been failing to service stores properly or at all; has been fraudulently misrepresenting to Best Brands how often Premium's employees are visiting stores; has been reporting multiple visits to stores which never

took place; has been reporting higher number of hours spent at various stores than the amount of hours actually spent there; has not been conducting the servicing of the clip strip products desperately needed in those stores; and when conducting such services has been doing so very poorly.

30.   For example, Premium has claimed that it has been sending representatives to regularly visit and service all of Walmart's stores.

31.   But, in fact, Premium has not been doing so.

32.   In numerous cases, managers at Walmart retail stores were not aware of any activities by Premium in their stores.

33.   Numerous managers were not even aware of Premium's existence.

34.   Store Managers, Assistant Store Managers, and Department Managers, in stores that Premium was supposedly servicing, have provided testimonials to Best Brands that they had never even heard of Premium.

35.   The poor performance and non-performance by Premium has also become apparent by inspecting the stores themselves.   By visiting Walmart retail stores, Best Brands has repeatedly observed, for example, that: shelves were messy; multiple differing items were improperly placed on the same clip strip; and many stores had clip strip merchandise in inventory in the backroom, while clip strips in the store for presentation to customers were bare.

36.   Premium's failure to fulfill its obligations has resulted in large numbers of lost sales for Best Brands at Walmart.

6

37.     Best Brands, in fact, has learned from Walmart that Premium was understaffed in about <u>two thousand</u> (2000) stores for an extended period of time.

38.     Yet, Best Brands was never informed of this by Premium.

39.     Nor was there any reduction in the invoices being sent by Premium in the charges for its services.

40.     Instead, Premium has been inflating its bills and charging for services which were never provided.

41.     Premium began its merchandising services program in January 2018.

42.     At that time, it promised full transparency.

43.     It alleged that it would be providing Best Brands with a tracking system, "Qtrax," which would allow Best Brands to track Premium's performance at stores, and which would be updated minute by minute.

44.     Premium asserted that the system would show exactly when its employees were checking in and out of stores, so that performance and staff hours could be monitored.

45.     At the outset, Best Brands often accessed Qtrax as it was eager to see how its products were being serviced, products which are a substantial part of Best Brands' business and livelihood.

46.     However, as the months progressed, Premium's performance deteriorated, and so did its transparency.

47.     As time went on, Premium provided only limited data regarding its service and performance.

7

48.     Premium failed to provide the proper and timely reporting and communication that it had promised.

49.     Concurrent with Premium's decrease in performance, Premium cut out the full transparency it promised to cover up: its decrease in performance, its failure to fulfill its contractual obligations, its overbilling for services performed, and its billing for services that were not being performed.

50.     In March 2018, Best Brands was cut out from any access to Qtrax altogether.

51.     As such, there was no longer any accountability whatsoever from Premium, since Best Brands could no longer access any data in the Qtrax system.

52.     At the same time, conflicting and confusing reports were provided by Premium to Best Brands regarding alleged store visits, amounts of store visits, and the timing of store visits.

53.     Also, at the same time, Best Brands' bills during this timeframe (March through November 2018) skyrocketed as compared to the initial months of service (January to February 2018).

54.     All in all, Best Brands paid Premium Retail $4,065,865 for calendar year 2018.

55.     Yet, Premium significantly underperformed its responsibilities and was very understaffed during that period.

8

56.     In other words, Best Brands has paid substantial sums, but has received substandard service from Premium, performance well below what was required of Premium and agreed to, and repeated non-performance.

57.     Moreover, Premium has unilaterally increased the  number of hours it is allegedly servicing stores, and thus, the number of hours it is billing for, without obtaining prior approval from Best Brands.

58.     Without Best Brands' knowledge or approval, Premium increased its billing from two hours per visit per store to three hours per visit per store.  In other words, Premium unilaterally increased its service bills by 50%.

59.     Best Brands learned about this alleged increase in service hours (which was never agreed to), when Best Brands asked for an explanation as to why its invoices had nearly doubled in price.

60.     Premium inflated its invoices, but, on information and belief, did not actually increase its staff hours in the stores it was alleging to have serviced.

61.     Furthermore, no improved sales results or store servicing were seen by Best Brands from Premium's alleged increase in service.

62.     As noted above, Premium has been understaffed in very many Walmart stores.  Yet, Premium did not report this understaffing to Best Brands, and did not reduce the price of its invoices.  Rather, Premium charged Best Brands full price as if all of Walmart's stores were being fully serviced.

9

63.     Walmart's store associates have reported to Best Brands that they are often forced to pack out the clip strips themselves, that there is poor housekeeping, and messy product displays in the stores.

64.     They have also reported that there are outages of products on clip strips that are not being refilled even though there is plenty of inventory in the backroom – i.e., that the backrooms were full of the clip strip products in inventory, but the clip strips on the sales floor remained empty as no one was putting the products out.

65.     In fact, employees of Premium have themselves admitted, that in at least one instance, a Walmart store did not have an active service representative for an extended period of time.

66.     Yet, Premium reported and charged Best Brands for between 4 and 7 visits per week over the prior 12 weeks in that store, despite the fact that the store actually had no Premium service representative putting in any hours there.

67.     That the store visits being charged by Premium are inaccurate is further demonstrated by the fact that, in many Walmart stores, the Walmart manager in the store has no knowledge of the Premium representative or the alleged service. It is not possible that a Premium representative could be visiting and servicing a store 150-200 times over the course of the year, but that the store manager has no knowledge of it.

68.     Premium's failure to abide by its commitments and responsibilities has resulted, *inter alia,* in messy product presentation in stores, and in empty clip strips which have not been properly refilled from backroom inventory, leading to lost sales by Best Brands.

10

69.     In late Spring 2018, Premium Retail was put on a 30-day probation by Walmart because of Premium's inferior service performance.

70.     Yet, instead of improving its performance, Premium has increased its bills, while continuing its poor performance.

71.     That underperformance and non-performance is ongoing to this day.

72.     In Fiscal Year 2019, Premium switched to a more expensive and less transparent and accountable fee structure, namely, 5% of retail sales instead of a fee structure based on staff hours.

73.     Yet, upon information and belief, Premium in 2019 is not servicing on average at least 20% of the stores that they should be servicing on a weekly basis.

74.     Upon information and belief, Premium is putting out at least 11% less cases in 2019 than last year, yet it is charging Best Brands even more than last year.

75.     Upon information and belief, in the stores Premium is actually servicing, Premium is working less hours than its commitment.

76.     Upon information and belief, it is estimated that Premium has been overcharging Best Brands millions of dollars on an annual basis, not including the damages to Best Brands from the lost sales caused by Premium's failure to perform.

77.     Upon information and belief, weekly reports from Premium have fraudulently included inaccurate data and fallacies in order to hide Premium's underperformance and non-performance.

78.     When issues with Premium's performance came to Best Brands' attention, Best Brands complained about the quality of Premium's services, questioned whether

11

Premium was actually performing the contractual services required, and began investigating whether Premium was properly performing.

79. To that end, Best Brands' personnel visited numerous Walmart stores to determine whether Premium was abiding by the terms of the Service Relationship and agreement of the parties.

80. In many instances, it was independently confirmed by Best Brands that Premium was not servicing Best Brands' products as they were required to under the terms they negotiated.

81. After Best Brands determined that Premium was not properly servicing Best Brands' products in Walmart, Best Brands ceased making further payments to Premium in March 2018.

82. After trying to resolve the issue directly with Premium on December 4, 2018 to no success, Best Brands was left with no choice but to threaten to Premium that Best Brands would need to bring the matter up with Walmart.

83. Upon information and belief, after Premium's December 4, 2018 meeting with Best Brands but prior to Best Brands' meeting of December 20, 2018 with Walmart, Premium contacted Walmart and misrepresented the good faith negotiation which took place between Best Brands and Premium in an attempt to resolve the issues surrounding Premium's actions.

84. Thereafter, the President of Best Brands had a meeting with various executives and a buyer at Walmart on December 20, 2018, regarding the inferior performance of Premium. During this meeting, Best Brands brought up its ethical and

12

poor performance concerns regarding Premium.  Best Brands informed Walmart that it had come to Best Brands' attention that Premium was defrauding Walmart's clip strip suppliers by not conducting some or all of the services that Premium had been hired to provide.

85.    During Best Brands' meeting with Walmart on December 20, 2019, it became apparent that Premium had previously "bad mouthed" Best Brands to Walmart in advance of the December 20th meeting.

86.    Upon information and belief, Premium misrepresented Best Brands' interactions and negotiations with Premium, and defamed Best Brands to Walmart. Premium misrepresented to Walmart that Best Brands was unjustifiably withholding payment for invoices, misrepresented the surrounding circumstances, and impugned the integrity of Best Brands and its President.

87.    Upon information and belief, Premium also falsified its performance data regarding its merchandising services, and misrepresented to Walmart that it was properly performing its services for Best Brands.

88.    Premium also falsely represented to Walmart that the reason Best Brands could not access the Qtrax system is because Best Brands' passwords and logins "were not updated," which was false.  Best Brands frequently complained to Premium that it could not access Qtrax, and that the system was down, or their access was simply being denied, despite the fact that the account and passwords were valid.

89.    However, in fact, Premium intentionally did not give Best Brands access to the promised Qtrax tracking technology.

13

90.     Upon information and belief, Premium withheld Best Brands' access to conceal Premium's underperformance and Premium's non-performance.

91.     Premium's misrepresentations to executives at Walmart regarding Best Brands angered the executives at Walmart vis-à-vis Best Brands' lack of payment and its alleged lack of integrity.

92.     Upon information and belief, Premium falsely accused Best Brands of dishonesty, improper dealings, and lack of integrity, which injured Best Brands' relationship with Walmart.

93.     Premiums' misrepresentations caused damage to Best Brands' business relationship with Walmart, and reduction of purchases by Walmart from Best Brands.

94.     As such, Premium has interfered with Best Brands' business with Walmart.   Premium's false accusations also resulted in lost business by Best Brands.

95.     Premium's false accusations and misrepresentations also resulted in, or contributed to, a shift to a new payment model involving payment of higher service costs by Best Brands to Premium in 2019.

96.     Upon information and belief, Premium used its defamatory statements as to Best Brands' withholding of payment, and as to Best Brands' integrity, and as to alleged unprofessional conduct by Best Brands, to induce Walmart to shift Premium's rate model to a new and higher payment model based on Best Brands' retail sales.

97.     Namely, the new rate model of 2019 requires payment to Premium of 5% of Best Brands' retail sales, which has caused increased invoices by Premium to Best Brands.

14

98.     That new payment model is also a violation of Premium's agreement with Best Brands to bill for services based on the actual number of hours conducted by Premium.

99.     Upon information and belief, Premium's motivation for the shift in rate schedule was also particularly based on Premium's desire to cover up its lack of hours, to further its scheme of being paid for nonperformance.

100.    The new rate schedule requires payment based on a percentage of retail sales of Best Brands' clip strip products in Walmart's stores.

101.    As it is not based on hours actually worked by Premium and/or on performance by Premium, the new rate schedule provides even less accountability for Premium's underperformance and non-performance. It results in payment to Premium for Best Brands sales in any given Walmart retail store even if Premium does not do its job in that store (with Walmart employees packing goods out into that store instead).

102.    Upon information and belief, Premium's defamatory statements caused Walmart to threaten to put Best Brands' account on a $30 million hold, and to threaten to return Best Brands' products, damaging Best Brands' relationship with Walmart.

103.    Premium has been unjustly enriched by taking money for services it has not provided, and services it did not properly or adequately provide.

104.    Premium has billed and collected millions of dollars for services which were never provided, and for services which were inadequately provided.

105.    As a result, Best Brands seeks herein the return of funds for payment for services which Premium did not perform and/or did not adequately perform.  Best Brands

15

seeks further damages for the business it lost due to Premium's lack of "packing out" Best Brands' products so that consumers could purchase such items.  Best Brands further seeks a judgment that no further fees are due to Premium for alleged services after the date of Best Brands' last payment.

106.    Best Brands further seeks a judgment that Premium has been committing breach of contract, breach of express warranty, and fraud.

107.    Yet furthermore, Best Brands has spent years building up a relationship and good reputation with Walmart.

108.    There has been a long-standing business relationship between Best Brands and Walmart.

109.    Premium, a third party, is aware of the business relationship between Best Brands and Walmart as it obtained the merchandising position to service Best Brands' products at Walmart.

110.    Upon information and belief, Premium has purposely and improperly interfered with these business relations and has defamed Best Brands to Walmart.

111.    Premium's breach of contract, breach of express warranty, fraud, tortious interference, and trade defamation, were all conducted by Premium intentionally, willfully, and in bad faith, and have caused Best Brands to suffer damages.

112.    Plaintiff has been damaged by Defendant's illegal actions in an amount to be determined by a jury and this Court, including, but not limited to, repayment of Best Brands' payments to Premium for Premium's alleged services, recovery and relief for Best Brands' attorneys' fees and costs, recovery for Best Brands lost sales and lost profits

due to Premium's actions, voiding of open invoices from Premium for services that Premium did not perform or inadequately performed, and damages for the harm to Best Brands' reputation and good will resulting from Premium's actions.

113.    For each of Best Brands' counts below, Best Brands has been extensively damaged by Premium's actions based on the amounts paid by Best Brands to Premium, the amounts Premium still seeks to collect for its underperformance and non-performance, Best Brands' lost sales and lost profits as a result of Premium's actions, and the damage to Best Brands' relationship with Walmart as a result of Premium's actions.

## COUNT I
## PREMIUM'S BREACH OF CONTRACT

114.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

115.    Premium and Best Brands have an agreed oral and/or written agreement, i.e. a contract for services.

116.    That agreement was based on the terms negotiated by Walmart with Premium, that were agreed to by Premium and Best Brands, and was based on the communications and materials exchanged between Premium and Best Brands.

117.    As further discussed above, the parties had an agreement in which Premium promised it would be providing various merchandising services in Walmart's stores.

118.    Premium subsequently represented (both in invoices and otherwise) that it fully provided those services.

119.   Best Brands has paid millions of dollars for Premium's alleged services, but on many occasions and in many stores, Premium has not provided those services in part or in whole.   Walmart itself, for example, has estimated that Premium was understaffed in about <u>two thousand</u> (2000) stores for an extended period of time.

120.   Furthermore, Premium promised it would provide full transparency and accountability to Best Brands, with a technology that would allow Best Brands to track the progress of Premium's performance.

121.   Premium then cut off Best Brands' access to that technology.

122.   Best Brands has performed its end of the agreement by previously paying Premium millions of dollars for the required services.

123.   Premium, however, has repeatedly breached its promises and duties under the agreement, as discussed above.

124.   Best Brands has been damaged in the amounts it has paid to Premium, but which Premium did not earn.   Best Brands has also been damaged in the amounts that Premium has further charged for Premium's underperformance and non-performance of services.

125.   Moreover, sales of Best Brands' clip strip products were directly dependent on the services that Premium represented it would conduct.

126.   Premium was paid to service Best Brands' products, so as to boost the sales of those products, and was paid a very large sum to do so, but failed to live up to its contractual obligations.   As a result, Best Brands has sustained extensive damages due to Premium's breaches, in an amount to be determined by the jury in this matter. As set

18

forth in the foregoing paragraphs, Best Brands has been damaged in the amount of payments made by Best Brands to Premium, the further amounts billed thereafter, and the lost sales and profits caused by Premium's underperformance.

127.    Premium's wrongful actions constitute breach of contract under the laws of the State of New York.

## COUNT II
## PREMIUM'S BREACH OF EXPRESS WARRANTIES

128.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

129.    Premium and Best Brands have an agreed written and/or oral agreement, as discussed above.

130.    That agreement contained express warranties by Premium with respect to various material facts, including, warranties that Premium had the ability to fully service Walmart's retail stores, and that Premium would, in fact, fully service Walmart's retail stores for Best Brands.

131.    Those warranties by Premium were part of the basis of the bargain.

132.    Those express warranties were breached by Premium.

133.    Best Brands has sustained damages as a direct result of Premium's breaches, in an amount to be determined by the jury in this matter. For example, Best Brands has been damaged in the amount of payments made by Best Brands to Premium, and the further amounts improperly billed by Premium on open invoices, as well as the lost sales and profits caused by Premium's underperformance, and Best Brands is entitled

19

to recover its damages incurred as a result of Premium's breaches, in an amount to be determined by the jury in this matter.

134.   Premium's wrongful actions constitute breach of express warranties under the laws of the State of New York.

## COUNT III
## PREMIUM'S UNJUST ENRICHMENT *IN QUANTUM MERUIT* <u>FOR ITS FAILURE TO PERFORM SERVICES</u>

135.   Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

136.   In the alternative to recovery for Premium's breach of contract, Best Brands seeks recovery *in quantum meruit*, i.e. for Premium's unjust enrichment.

137.   As set forth above, Premium has wrongfully benefited at Best Brands' expense, and equity and good conscience require restitution of the amounts previously paid by Best Brands to Premium.  For example, Best Brands has been damaged in the amount of payments made by Best Brands to Premium, and is entitled to recover its damages incurred as a result of those breaches, in an amount to be determined by the jury in this matter.

138.   Best Brands further seeks equitable relief for this count and its causes of action in each of its counts and claims herein, in the absence of an adequate remedy at law.

139.   Premium's wrongful actions require restitution for unjust enrichment under the laws of the State of New York.

20

## COUNT IV
## <u>PREMIUM'S FRAUD</u>

140.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

141.    Premium represented that it had the capacity to provide the necessary merchandising services for all of Walmart's stores.

142.    Premium also represented that it would provide all those services for Best Brands' clip strip products at Walmart.

143.    Premium also subsequently represented that it had provided all those services.

144.    Upon information and belief, Premium intended to deceive Best Brands by claiming that it would perform the above-mentioned services, when Premium  knew that it would not and/or could not.

145.    Furthermore, Premium has also falsely represented the extent of the services conducted in Walmart's stores.

146.    Premium has falsely reported store visits which never occurred, has falsely reported the frequency of visits to stores which were visited, and has falsely reported the number of hours spent by the representatives in stores during visits.

147.    *Inter alia*, Premium failed to send representatives to large numbers of Walmart stores, failed to refill empty clip strips with products, failed to make sure product presentation was proper, failed to report accurately or inaccurately reported Premium's service performance, and failed in general to properly service the needs of the Walmart stores with regard to the clip strip products in those stores.

21

148.    Premium also sent invoices falsely representing that those services had been provided, and charging for those services.

149.    Even though Premium did not perform the services it represented and that were required, it nonetheless billed Best Brands for those services.

150.    Premium further deceived Best Brands by sending inflated invoices for services that Premium did not provide properly.

151.    Premium inflated its invoices, and charged unjustifiable amounts to Best Brands.

152.    Premium made its false representations to induce Best Brands to rely upon them, and to extract payment from Best Brands for services which were not being provided at all and/or not being provided properly.

153.    Best Brands justifiably relied on Premium's representations as to the services being provided, including, for example, the representations that Premium had capacity, and that Premium would provide the requisite merchandising services throughout Walmart's chain of stores, and the subsequent representations that Premium had provided those services.

154.    In fact, Premium cut off Best Brands' access to technology for tracking Premium's servicing efforts, to induce Best Brands to rely on Premium's representations as to the extent and amount of services being provided, both in individual stores and over the course of the entire Walmart chain.

155.     Best Brands justifiably relied on Premium's representations in view of the nature of Premium's relationship with Walmart, Premium's relationship with Best Brands, and Best Brands' relationship with Walmart.

156.     Best Brands also justifiably relied on Premium's representations in view of the fact that Best Brands did not have contact with each of Premium's service representatives or other means to directly track the time and activities of each of those service representatives.

157.     In reliance on Premium's representations, Best Brands also paid for Premium's services.

158.     Premium knew that its representations were false, and/or made the representations recklessly without regard to whether they were true or false.

159.     Premium made its representations to induce reliance on them, and Best Brands relied on those representations.

160.     Best Brands justifiably relied on Premium's representations.

161.     Best Brands has sustained damages as a result of Premium's misrepresentations.

162.     Best Brands has paid extensive amounts to Premium for services that Premium falsely alleged would be provided, and then falsely alleged were provided. However, those services were not provided as represented by Premium.  In some instances, the services were not provided at all, and in others, they were not provided in the amounts and scope that Premium alleged and billed for.

163.    Moreover, sales of Best Brands' clip strip products were directly dependent on the services that Premium represented it would provide.  Premium was paid to service Best Brands' products, to boost the sales of those products, which Premium was paid a very large sum to do.

164.    As a result, Best Brands was damaged in the amount of payments made by Best Brands to Premium, and the amounts falsely billed by Premium, as well as the lost sales caused by Premium's underperformance, in an amount to be determined by the jury in this matter.

165.    Premium has engaged in cunning, deception, or artifice, to deceive or gain an unfair advantage to the detriment of Best Brands.

166.    Premium's wrongful actions constitute fraud under the law of the State of New York.

**COUNT V**
**PREMIUM'S TORTIOUS INTERFERENCE**
**WITH CONTRACT AND PROSPECTIVE ECONOMIC RELATIONS**

167.    Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

168.    There has been a long-standing business relationship between Best Brands, the supplier, and Walmart the retail chain of stores which Best Brands supplies products to.

169.    Premium, a third party, is aware of the business relationship between Best Brands and Walmart, and in fact, obtained its position to service Best Brands' products at Walmart (as well as other supplier's products).

24

170.    Premium purposely and improperly interfered with Best Brands' business relations by, *inter alia*, making false statements about Best Brands to Walmart.

171.    Upon information and belief, after its December 4, 2018 meeting with Best Brands, Premium contacted Walmart and misrepresented the good faith negotiations which had taken place between Best Brands and Premium.

172.    Upon information and belief, Premium misrepresented Best Brands' interactions and negotiations with Premium, and defamed Best Brands to Walmart. Premium misrepresented to Walmart that Premium was performing properly, that Best Brands was unjustifiably withholding payment for invoices, and that there was a lack of integrity by Best Brands.

173.    Premium likewise falsely represented to Walmart that the reason Best Brands could not access the Qtrax system is because Best Brands' passwords and logins were not updated, which is untrue.

174.    Premium intentionally acted by wrongful means.

175.    Upon information and belief, Premium made derogatory, false, and deceitful statements to Walmart about Best Brands and Best Brands' integrity to cover up Premium's own fraudulent conduct.

176.    Upon information and belief, Premium's statements caused damage to the relationship between Best Brands and Walmart, and caused Best Brands' business to decline, including loss of sales and product placement contracts which were diverted by Walmart from Best Brands to other suppliers.

177.    As such, Premium has intentionally interfered with Best Brands' existing

contracts and prospective business relations with Walmart. This interference was intentionally done by Premium and has caused Best Brands to suffer damages and injury to its relationship with Walmart.

178.   Premium's wrongful actions constitute tortious interference under the laws of the State of New York.

**COUNT VI**
**PREMIUM'S TRADE DEFAMATION OF BEST BRANDS**

179.   Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs, as if fully set forth herein.

180.   Upon information and belief, Premium's executives, including, but not necessarily limited to, Mike Kopper, Brian Travers, Paul DeCarlo, and/or Bill Campbell made false and defamatory statements in December 2018, about Best Brands and its executives, including about Best Brands' President.

181.   Upon information and belief, those statements were made to Walmart executives, including, but not necessarily limited to, Walmart Vice President Joe Grady, Walmart Senior Director of Merchandise Operations Rhonda Berry, and Walmart Buyer for Checkout and Impulse Strips Clay Hoyt.

182.   Upon information and belief, Premium made false statements impeaching the integrity of Best Brands and/or its executives, including, Best Brands' President; statements both impeaching their integrity as a corporation and as individuals, and impeaching the integrity of their business methods.

183.   Upon information and belief, Premium misrepresented Best Brands' interactions and negotiations with Premium, misrepresented to Walmart that Premium

was performing properly, misrepresented that Best Brands was unjustifiably withholding payment for invoices, misrepresented that this was based on a lack of integrity by Best Brands, and misrepresented improper performance of Best Brands' duties or unprofessional conduct by Best Brands and its executives, including Best Brands' President.

184.   Upon information and belief, Premium made derogatory, false, and deceitful statements to Walmart about Best Brands and Best Brands' integrity to cover up Premium's own fraudulent conduct and poor performance.

185.    Premium engaged in unprivileged publication of those statements to a third party, namely, Walmart.

186.   Premium is at fault due to its bad faith, intentional, and malicious, or at least negligent, publication of those statements.

187.   Premium's statements constitute defamation *per se*, and there is actionability of those statements irrespective of special harm, or there is special harm caused by the publication.

188.   Upon information and belief, Premium's defamatory statements caused loss of economic or pecuniary value to Best Brands.

189.   Upon information and belief, Premium's statements caused Walmart to threaten to put Best Brands' account on a $30 million hold, and to threaten to return Best Brands' products, forcing Best Brands to pay the outstanding invoices issued by Premium, and to reduce Walmart's purchases from its long-time supplier Best Brands, with a shifting of business to other suppliers.

190.     Upon information and belief, Premium's statements caused damage to the relationship between Best Brands and Walmart, and caused Walmart to decrease the volume of business conducted by Best Brands at Walmart, or were a material and substantial part of a decision by Walmart to decrease its purchases from Best Brands.

191.     Upon information and belief, Premium also used its defamatory statements as to Best Brands' withholding of payment, as to Best Brands integrity, and as to alleged unprofessional conduct by Best Brands, to induce Walmart to shift Premium's rate model to a new and higher payment model based on Best Brands' retail sales.

192.     Namely, the new rate model of 2019 requires payment to Premium of 5% of Best Brands' retail sales, which has caused increased invoices by Premium to Best Brands.

193.     Upon information and belief, Premium's motivation for that shift in rate schedule was also particularly based on Premium's desire to cover up its lack of hours, to further its fraudulent scheme of being paid for underperformance and nonperformance.

194.     The new rate schedule, based on the retail sales of Best Brands' products (whether or not Premium employees actually perform and pack goods out into the store), rather than based on hours worked by Premium, provides even less accountability for Premium's underperformance and non-performance, so as to further advance and perpetuate Premium's fraudulent activities.

195.     Upon information and belief, Premium's statements were calculated to interfere with the relationship between Best Brands and Walmart, to Best Brands' detriment, and Best Brands has been damaged by those statements.

196.     Premium's wrongful actions constitute trade defamation under the laws of the State of New York as a result of its actions.

## JURY TRIAL DEMAND

197.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues herein that are properly triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court, upon final hearing of this matter, grant the following relief against Defendant:

A.     That Defendant be adjudged liable for breach of contract;

B.     That Defendant be adjudged liable for breach of express warranty;

C.     That Defendant be adjudged liable for unjust enrichment;

D.     That Premium be adjudged to have engaged in fraud;

E.     That Premium be adjudged to have engaged in tortious interference with the business relations of Walmart and Best Brands;

F.     That Premium be adjudged liable for trade defamation;

G.     That Premium be ordered to refund to Best Brands some or all of the funds previously paid to Premium, and that Premium be ordered to reduce or void all outstanding invoices;

H.     That Premium be ordered to pay Best Brands *in quantum meruit* for monies that Premium received even though it did not properly perform the servicing for Best Brands' clip strip products at Walmart stores;

I.     That Premium be ordered to pay Best Brands for the lost sales and lost

profits which Best Brands suffered as a result of Premium's actions;

J.     That Premium be liable to pay Best Brands for any and all damages suffered by Best Brands for the acts of Premium complained of herein;

K.     That Premium be liable to pay Best Brands enhanced damages, including, but not limited to punitive damages, due to the nature of the acts of Premium, and that Premium further be liable to pay any and all further recoveries, in the maximum amount available under law and equity;

L.     That all further defamatory statements after the date of this Complaint be adjudged willful, malicious, and that punitive damages be awarded against Premium for all such statements;

M.     That Premium be enjoined from further engaging in its illegal acts complained of herein, and from any and all further defamatory statements regarding Best Brands, its officers, and employees;

N.     That Best Brands be awarded pre-judgment and post-judgment interest on all amounts awarded;

O.     That Best Brands be awarded its attorney's fees and costs for this action;

P.     That Best Brands obtain all further relief permitted under the laws of the United States and the State of New York; and,

Q.     That Plaintiff obtain all such other and further relief as the Court may deem just and equitable.

Dated: August 20, 2019                     */s/Morris E. Cohen*

Morris E. Cohen (MC-4620)
Lee A. Goldberg (LG-9423)
Limor Wigder (LW-1986)
GOLDBERG COHEN LLP
1350 Avenue of the Americas, 3rd Floor
New York, New York 10019
(646) 380-2084 (phone)
(646) 514-2123 (fax)
MCohen@GoldbergCohen.com
LGoldberg@GoldbergCohen.com
LWigder@GoldbergCohen.com